City Chevrolet Company v. Commissioner.
City Chevrolet Co. v. Commissioner
Docket No. 36280.
United States Tax Court
T.C. Memo 1954-155; 1954 Tax Ct. Memo LEXIS 93; 13 T.C.M. (CCH) 874; T.C.M. (RIA) 54261; September 20, 1954, Filed *93 Amounts deductible by petitioner corporation in 1945 and 1946 as reasonable compensation of its president and vice-president determined on the facts. Federic D. Dassori, Esq., and Dee R. Bramwell, Esq., for the petitioner. James R. Harper, Jr., Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion Respondent determined deficiencies against petitioner as follows: Declared Value
Income
Excess
Excess
Year
Tax
Profits Tax
Profits Tax
1945
$398.39
$8,788.73
1946
$23,093.22
The sole issue for decision is the correctness of respondent's action in disallowing, as excessive compensation, bonuses paid by petitioner to its president and vice-president totaling $9,055.34 in 1945 and $61,763.38 in 1946. Other matters covered by the deficiency notice have been conceded by petitioner and will be given effect under Rule 50. Findings of Fact City Chevrolet Company, petitioner herein, is a North Carolina corporation doing business in Charlotte, North Carolina. Its corporation income and declared value excess profits tax return for the calendar year 1945 and its corporation income tax return for the *94 calendar year 1946 were filed with the collector of internal revenue for the district of North Carolina. In 1935 it was the policy of General Motors Corporation to select men of ability and promise to assume the management of its dealer operations and eventually to acquire full ownership. In implementing that plan, General Motors was willing to provide a large percentage of the initial capital investment in order to enable the selected executives to get started with limited amounts of cash. General Motors was anxious in early 1935 to strengthen one of its dealerships at Charlotte, North Carolina, which up to that time had been under-capitalized and generally unsuccessful. In accordance with its plan, it sought to obtain the services of P. L. Abernethy. Abernethy received his first experience in the automobile business as a bookkeeper for Burrell-Walker Company where he worked for three years commencing in 1919. He left that company to work for three years as a salesman in a grocery business at Newton, South Carolina. Abernethy then returned to the automobile business in Charlotte as a bookkeeper for Carolina Cadillac Company where he worked until October 15, 1928, at which time *95 he obtained employment with the Chevrolet Dort Division of General Motors in Charlotte and later in Atlanta. In Charlotte he was the office manager and car distributor for North Carolina and South Carolina until 1934 when he was promoted to the job of regional car distributor in Atlanta, Georgia. His responsibilities covered the Chevrolet operations in the States of North and South Carolina, Georgia, Alabama, Florida, and parts of Tennessee and Kentucky. A part of each month during this period was spent in the main office of Chevrolet in Detroit where, along with nine other regional car distributors, he helped formulate schedules for the various plants throughout the country. Petitioner was incorporated on January 22, 1935. The initial investment of General Motors was $27,000 and Abernethy invested $3,000. Among the purposes for which the corporation was formed were the following, as set forth in the articles of incorporation: "(1) To purchase, rent, manufacture, deal in, sell, operate and let for hire, automobiles, motor cycles, and motor vehicles and supplies and fittings therefor of every kind and nature. "(2) To erect, purchase, lease or otherwise acquire and to maintain *96 and operate filling stations and garages for the sale of gasoline, oils and other automobile supplies, and the storing, caring for and repairing of automobiles and motor vehicles of every kind, nature and description. "(3) To make and sell parts, supplies, batteries and accessories connected with the use of motor cars and vehicles; to store, clean and repair automobiles and motor vehicles and to replace their parts, and to do all other things incidental to the business of conducting a dealership for the sale of new and used automobiles, garages, repair shops, or other businesses profitable in connection therewith." Petitioner received a franchise from Chevrolet authorizing it to sell and service Chevrolet passenger and commercial vehicles under which it operated from 1935 throughout the years in question. Petitioner's authorized capital stock upon incorporation was $99,600 consisting of 2,768 shares, of which 608 shares were designated Class A common stock, having a par value of $75 a share, and 2,160 shares of Class B common stock, having a par value of $25 a share. On January 22, 1935, General Motors subscribed for 320 Class A voting shares and 118 Class B shares of petitioner's *97 stock, two nominees of General Motors subscribed for one Class B share each, and P. L. Abernethy subscribed for 120 Class B shares. The holders of Class A stock issued and outstanding had all voting rights, had equal participation with Class B stock in dividends, had an option to convert one or more shares of Class A stock for an equal number of shares of Class B stock and, in the event of liquidation, had the prior right to receive up to $85 per share before participation in the net assets by the Class B stock. The holders of any Class B stock issued and outstanding were to obtain voting rights only when no shares of Class A stock were issued and outstanding; had equal participation with Class A stock in dividends and, in the event of liquidation after the net assets had been distributed up to $85 per share to holders of Class A stock, had the right to receive up to $85 per share of the remaining net assets and to participate equally with Class A stock in any net assets then remaining. Subsequent amendments to the certificate of incorporation resulted in fixing the authorized capital stock of the corporation at $97,000, consisting of 970 shares $100of par value each, of which *98 470 shares were Class A and 500 shares were Class B. Pursuant to amendment of the certificate of incorporation on April 29, 1935, the stockholders surrendered their original certificates and new certificates were issued on April 30, 1935, as follows: General Motors
270 Class A
Herbert M. Gould (General Motor's
nominee)
1 Class A
J. A. Ayers (General Motor's nomi-
nee)
1 Class A
P. L. Abernethy
30 Class B
On April 30, 1935, General Motors subscribed to an additional 58 shares of Class A stock and on May 30, 1936, it purchased an additional 90 shares of Class A stock. On January 22, 1935, at the meeting of the incorporators, Abernethy and the two nominees of General Motors were elected as the directors of the corporation. The board of directors, during the entire period from January 22, 1935 to March 19, 1941, consisted of three members one of whom was Abernethy, the other two being at all times nominees of General Motors. The powers of the directors and shareholders, as set forth in the certificate of incorporation, included the following. "(4) Any and all of the directors of the corporation may be removed at any time with or without cause by the *99 owners and holders of a majority of the issued and outstanding voting stock of the corporation. "(5) The Board of Directors are expressly authorized to remove at any time with or without cause any officer of the corporation elected by them. "(6) When, in the judgment of a majority of the Board of Directors, it is deemed advisable, the Directors, upon vote or written consent of two-thirds in interest of all the Stockholders, shall have the right at their election to dissolve the corporation and sell its assets, wind up its business affairs, and distribute its assets and the proceeds thereof among its Stockholders as they may severally be entitled to receive the same as aforesaid." On January 22, 1935, at the first meeting of the directors of the corporation, Abernethy was elected president, his salary being fixed at $350 per month. On April 30, 1935, the directors authorized a bonus agreement between the corporation and Abernethy. The paragraphs of that agreement here pertinent provided as follows: "3. The Dealer Company agrees to pay the Operator, as its President, in addition to his salary, a bonus equivalent to 50% of its net earnings commencing January 22, 1935, for the *100 balance of the calendar year (and thereafter from calendar year to calendar year) in excess of 15% on its average month-end invested capital during said year or period. "4. Net Earnings as used in the foregoing paragraph shall mean the net profits of the Dealer Company before deducting the bonus expense herein provided for. The accounting and reserve policies and procedures adopted from time to time by the Dealer Company shall be used as the base for determining said net earnings and profits." The bonus was computed after the deduction of income taxes. In 1935 Abernethy had an agreement with General Motors to acquire the voting stock out of dividends and 50 per cent of his bonus. There was no fixed period during which the stock had to be acquired. Commencing with June 5, 1936, Abernethy purchased Class A shares from General Motors from time to time and had them converted to Class B shares. The final transfer to Abernethy was made on March 11, 1941, and thereafter General Motors held no stock interest in petitioner. After March 11, 1941, there was no Class A stock outstanding and the exclusive voting rights were held by the Class B stockholders. On March 19, 1941, P. L. Abernethy *101 transferred 275 Class B shares to E. R. McHenry. On the same date, Abernethy transferred one share to his wife, Violet M. Abernethy. After these transfers, Abernethy held 274 Class B shares. On March 19, 1941, at a special meeting of the directors, the General Motors nominees resigned as directors and E. R. McHenry and Violet Abernethy were elected as their successors. E. R. McHenry was also elected vice-president. Abernethy continued as a director and the board has remained unchanged through the years in question. At the special meeting on March 19, 1941, the board of directors authorized and adopted a Bonus Agreement between P. L. Abernethy and the corporation. The paragraphs of that Agreement here pertinent provide as follows: "3. The Dealer Company agrees to pay the Operator, as its President, in addition to his salary, a bonus equivalent to 25% of its net earnings commencing January 1st, 1941, for the balance of the calendar year (and thereafter from calendar year to calendar year) in excess of 15% on its average month-end invested capital during said year or period. "4. Net Earnings as used in the foregoing paragraph shall mean the net profits of the Dealer Company before *102 deducting the bonus expense herein provided for. The accounting and reserve policies and procedures adopted from time to time by the Dealer Company shall be used as the base for determining said net earnings and profits." At the same meeting, a bonus agreement was entered into between the corporation and McHenry which in all material respects was identical with the Abernethy agreement. On June 8, 1944, the stockholders in the corporation were altered by gifts to the respective wives of the stockholders so that on and after that date, including the years 1945 and 1946, the stock ownership was as follows: Name
No. Class B Shares
P. L. Abernethy
145
E. R. McHenry
140
Violet Abernethy
130
Lettie S. McHenry
135
Gift tax returns were filed by Abernethy and McHenry covering the gifts to their respective wives. The premises on South Tryon Street in Charlotte occupied by the former dealer were in very bad condition when Abernethy commenced business as president and operator of City Chevrolet Company. The equipment was useless and the building had to be renovated throughout. The personnel organization, consisting of only about 18 people, was very poor. Abernethy *103 customarily spent 12 to 18 hours a day re-vamping the whole organization. He personally supervised the entire operation, including the office, the parts department, the service department, and the used car reconditioning department. Street repairs completely blocked off the main entrance in 1935 from May or June until September, the only available entrance being through a narrow back street. This tended to handicap operations and kept used cars covered with dust. At that time, Abernethy established bank credit and obtained financial aid from the American Trust Company in Charlotte, which credit has been maintained and expanded since that time. In November 1935 petitioner first hired McHenry as new car sales manager. McHenry had been highly recommended by the zone manager, T. D. Hunter. McHenry's major experience in the automobile industry began in 1914 as a field employee of the Ford Motor Company. In 1921, with two partners, he operated his first dealership, selling Fords in Owensboro, Kentucky. He continued to operate at Ownesboro until 1923, at which time he and his two partners obtained another Ford dealership in Bowling Green, Kentucky. McHenry personally supervised the Bowling *104 Green Company while the other two partners ran the Owensboro dealership. In July 1926 both businesses were sold and each partner made about $100,000. McHenry returned to the automobile business during the years 1928 to 1932, with his former partners, as the Chevrolet dealer operating the McHenry-Stark Motor Company in Evansville, Indiana. Starting in the fall of 1933, he operated the McHenry Chevrolet Company in Indianapolis until May 1935. His contract with General Motors at that time provided for a bonus of 50 per cent of the profits after 15 per cent had been set aside. When he left Indiana, many dealers there were losing money and he came to North Carolina in search of a dealership in that section of the country. Petitioner made a net profit of $1,054.96 in 1935. In 1936 Abernethy changed service managers, added to the parts personnel and strengthened the used car reconditioning department by removing it from the general repair shop to a leased building across the street. The organization developed with McHenry handling sales to the extent that the company made a net profit of $16,743.47 in 1936. In 1937, the company made a net profit of $17,315.06. In June 1937 McHenry resigned *105 as new car sales manager to become the Chevrolet dealer in Wilson, North Carolina, and Abernethy continued to run petitioner alone. In 1938, the company made a net profit of only $948.26. McHenry had rejoined the company at Abernethy's request in December 1937 but left again to reduce expenses in May 1938 when the company lost $8,541.38 during the first four months of the year. The poor conditions resulted from an over-supply of 1937 models in the area at the time the 1938 model was announced. The over-supply was due largely to an out-of-state dealer's dumping 150 new 1937 models on the market through a Charlotte used car dealer. It took petitioner from November 1937 to March 1938 to sell its 1937 models at a substantial loss. In 1939, the company made a net profit of $21,906.74. Nineteen thirty-nine was a heavy production year requring the wholesaling of used cars at a loss. The profit per vehicle was as low as $25 to $30. McHenry rejoined the company in 1939 on a permanent basis. The company hired him as vice-president and Abernethy agreed to pay him 50 per cent of his bonus and to allow McHenry to buy one-half of the stock of City Chevrolet as he acquired it from General Motors. *106 From that time, Abernethy held 50 per cent of the stock he owned in trust for McHenry. In 1940, the company made a net profit of $25,817.41, even though it was a heavy production year and the used car market was poor. The company opened a separate truck service in 1940 in the building which had been rented for used car reconditioning. After McHenry rejoined petitioner in 1939, he had charge of sales and personnel and consulted with Abernethy on all operations. He and Abernethy together worked out the program for each department and one of them would present it to the department. Their responsibilities were essentially co-extensive although Abernethy looked after most of the financial part of the business and the factory contacts. The year 1941 was a heavy production year. Used cars were sold at a heavy loss. Some new cars had to be sold for $25 to $30 gross profit. Competition included another Chevrolet dealer, three Plymouth dealers, and two Ford dealers in Charlotte. In addition, there were located on the perimeter operating at low overhead another Chevrolet dealer and two additional Ford dealers. This tended to make petitioner dependent upon volume operation. In 1941, the *107 Government ordered a freeze on automobile production. At the end of the year, petitioner had a heavy inventory of 167 new cars and 40 used cars. Most dealers had heavy inventories at the time and were in a dilemma as to which way to turn. Abernethy and McHenry felt that the way to survival would be to have new models to sell and they took every unit the factory would deliver. Abernethy searched for additional cars, buying some from other dealers. As a result, by March 1942 petitioner had 242 new cars in various warehouses and storage areas. In 1941, petitioner' retail credit line with General Motors Acceptance Corporation was $600,000 as compared with $50,000 in 1935. Abernethy and McHenry started a training program for mechanics in 1941 and developed their service department each year following. During the years of no new car production, petitioner's survival depended primarily upon service operations and sale of parts and accessories. During those years, both Abernethy and McHenry spent 12 to 18 hours a day at work and conferred on policy matters and post-war planning for several hours on Sunday afternoons. In 1942, Abernethy was appointed chairman of the local unit of the *108 Office of Defense Transportation. Abernethy and McHenry planned petitioner's post-war building expansion program and completed important profit-making portions of the plan in 1946. They obtained for petitioner certain unimproved realty on January 8, 1946, for $16,000 and constructed the truck service building after obtaining a loan of $50,000 from the American Trust Company. In addition, they negotiated the purchase of another property for $30,000 on October 30, 1946, for future construction in 1947 of the paint and body shop building. They also negotiated for and purchased for $10,000 the parcel of property previously leased in 1945 for construction of the parts warehouse building. Parts and accessories sales were increased by having a wholesale man solicit new business in the vicinity of Charlotte by calling on garages, fleet users and other dealers. In 1945, in anticipation of expanding sales, Abernethy and McHenry hired a new car sales manager "in training" at a salary of $350 per month, plus one per cent of new car sales. He had limited responsibility and nothing to do with policy making. During 1945, 10 or 15 used car dealers entered business in Charlotte, raising the *109 total to 25 or more. This competition continued through 1946. On September 1, 1945, effective that date, the corporation restored Abernethy's and McHenry's salaries to $1,000 per month, eliminating the previous cuts of 1942. In the early part of 1946, a General Motors strike of 112 days caused cessation of new car and truck deliveries. The company kept operating on its parts and service business which had increased from covering approximately 70 per cent of fixed expenses to covering about 120 per cent of fixed expenses. Abernethy and McHenry adopted the policy of not requiring a trade-in in order to obtain a new car. They received only 72 or 73 trade-ins against more than 600 new units sold. Although petitioner was able to sell all cars it could obtain in 1945 and 1946, it was the policy of Abernethy and McHenry to sell only to those who deserved them and in no case did they require the purchaser to buy accessories which he did not want. These policies tended to build up the good will of petitioner. To prepare for keen competition anticipated in the future, Abernethy and McHenry began to train a complete new sales organization and to increase and improve personnel training *110 procedures. In 1946, Abernethy was elected president of the North Carolina Automobile Dealers Association. During 1935 through 1946, petitioner sold the following number of new and used cars and trucks: Year
New
Used
Total
1935
340
503
843
1936
673
1,204
1,877
1937
681
1,168
1,849
1938
392
872
1,264
1939
587
1,061
1,648
1940
886
1,590
2,476
1941
972
1,727
2,649
1942
153
313
466
1943
122
49
171
1944
34
13
47
1945
82
14
96
1946
660
78
738
During 1935 through 1946, an analysis of gross sales and profit for each department of petitioner shows the following: New Car Department
Used Car Department
Year
Gross Sales
Gross Profit
Gross Sales
Gross Profit
1935
$236,823.29
$ 48,327.42
$118,279.90
$ (5,679.49)
1936
493,003.01
110,943.33
264,429.14
(12,660.18)
1937
520,310.99
120,925.09
287,974.16
(16,348.32)
1938
315,821.67
71,474.28
225,408.10
(20,624.59)
1939
474,684.03
118,562.73
278,273.74
(23,110.11)
1940
722,931.15
172,883.58
426,310.72
(45,666.54)
1941
874,737.70
228,853.84
515,740.00
(55,439.09)
1942
154,596.60
44,305.26
101,997.94
5,707.16
1943
143,581.12
50,809.50
33,107.81
4,104.20
1944
50,455.78
12,547.84
7,153.24
807.27
1945
124,760.20
34,123.42
12,138.61
1,162.40
1946
820,251.73
188,395.61
51,963.12
5,510.89
*111 Service Department
Parts & Accessories Department
Year
Gross Sales
Gross Profit
Gross Sales
Gross Profit
1935
$ 33,699.77
$ 17,300.72
$ 29,803.34
$ 7,128.94
1936
56,536.05
27,713.86
51,977.22
11,498.81
1937
70,645.55
33,729.56
66,827.16
15,579.85
1938
57,264.44
28,716.80
59,413.01
14,256.64
1939
62,982.30
30,737.58
68,057.35
15,929.07
1940
974.54
173.65
85,363.01
41,793.51
85,042.95
19,689.47
1941
$ 16,175.73
$ 3,151.40
100,362.96
48,933.64
$114,863.38
$ 28,356.05
1942
68,450.53
35,182.22
91,722.67
23,103.84
1943
85,549.62
42,955.16
89,051.35
24,483.40
1944
97,927.92
50,026.70
125,398.74
33,123.88
1945
127,589.24
61,564.09
191,051.54
64,886.62
1946
191,853.34
79,816.27
250,754.50
105,380.10
Total All Departments
Gross
Gross
Year
Sales
Profit
1935
$ 416,606.30
$ 67,078.09
1936
865,945.42
137,495.82
1937
945,757.86
153,886.18
1938
657,907.22
93,823.13
1939
883,997.42
142,119.27
1940
1,320,622.37
188,823.67
1941
1,621,880.27
249,855.84
1942
416,767.74
108,298.48
1943
351,289.90
122,352.26
1944
280,935.68
96,505.69
1945
455,539.59
161,736.53
1946
1,414,822.69
379,103.37
*112 The salary paid to Abernethy from 1935 and the bonus paid in accordance with the bonus agreements were as follows: Year
Salary
Bonus
Total
1935
$ 3,966.67
1936
4,600.00
$ 5,237.36
$ 9,837.36
1937
6,250.00
4,656.80
10,906.80
1938
5,549.43
5,549.43
1939
5,708.38
6,828.37
12,536.75
1940
6,000.00
8,783.69
14,783.69
1941
10,250.00
7,667.52
17,917.52
1942
9,000.00
771.34
9,771.34
1943
9,000.00
3,308.34
12,308.34
1944
9,000.00
823.50
9,823.50
1945
10,000.00
4,527.67
14,527.67
1946
12,000.00
30,881.69
42,881.69
The salary paid to McHenry from the year 1941 and the bonus paid under the terms of the bonus agreement were as follows: Year
Salary
Bonus
Total
1941
$10,250.00
$ 7,667.52
$17,917.52
1942
9,000.00
771.34
9,771.34
1943
9,000.00
3,308.34
12,308.34
1944
9,000.00
823.50
9,823.50
1945
10,000.00
4,527.67
14,527.67
1946
12,000.00
30,881.69
42,881.69
Dividends were declared and paid in the amounts and years indicated and distributed to the shareholders in proportion to their holdings as follows: Year
Amount
1935
1936
$11,813.87
1937
13,326.50
1938
1939
14,179.00
1940
16,186.50
1941
27,549.50
1942
1943
$17,600.00
1944
3,300.00
1945
11,000.00
1946
1947
1948
1949
22,000.00
1950
44,000.00
*113 The average number of employees of petitioner during the years 1935 through 1946 was as follows: Year
Employees
1935
35
1936
56
1937
67
1938
50
1939
53
1940
63
1941
76
1942
50
1943
37
1944
40
1945
47
1946
68
In September 1951 all of the stock of City Chevrolet Company theretofore owned by Abernethy and McHenry was sold by them in an arm's length transaction to disinterested parties. The total compensation paid to Abernethy and McHenry for the year 1945 was a reasonable allowance for personal services rendered. Total reasonable compensation for the services of Abernethy and McHenry for 1946 was $50,000. The facts stipulated by the parties are incorporated herein by this reference. Opinion ARUNDELL, Judge: Respondent has limited the deductions for compensation of the company's president and vice-president to the amounts paid in the form of salaries and disallowed entirely the additional amounts paid them under the terms of a bonus plan. The bonus plan was originally installed at a time when General Motors or one of its subsidiaries held all of the voting stock, and the plan was a vital feature in a General Motors campaign to strengthen *114 its Chevrolet dealerships during the mid-1930's. The plan was continued after Abernethy and McHenry acquired all the stock of petitioner. We had occasion to consider the effect of such a bonus plan in , affd. , and there decided that once the ownership of the corporation's stock has passed to the officers receiving the bonus, the fact that the compensation was paid in strict accordance with the agreement is in no sense determinative of the question of its reasonableness. The reasonableness of the compensation paid to Abernethy and McHenry must be determined on the basis of all of the facts. We think the record makes it clear that both Abernethy and McHenry were executives of superior ability and broad experience in the automobile business and that petitioner was fully justified in paying each of them in 1946 more than the $12,000 basic salary respondent determined as reasonable compensation for each officer. The figure fixed by respondent was even less than the salary paid to Abernethy and McHenry in 1941 when each received approximately $18,000. The excellent and intelligent job done by these men *115 in the period between 1941 and 1946 in promoting and expanding the business was quite outstanding. In 1946 the two executives were well along on an expansion program involving the expenditure of some $300,000, requiring important decisions on their part and as much as 18 hours a day on the job. We are equally convinced, however, that some part of the total of $85,763.38 paid by the corporation in 1946 to its two top executives must be disallowed as excessive. The large increase in 1946 profits on which the bonuses are based, while due partly to the efforts of Abernethy and McHenry, were just as clearly caused by the general economic conditions at the time. Production of automobiles during the war years 1942 through 1945 was negligible, resulting in an excess of demand over supply in 1946. Under such circumstances, it was not too difficult to sell whatever new cars could be obtained. We cannot believe such large bonuses would have been paid to officers who were not stockholders at a time when the needs of the business were such as to make impracticable the payment of a dividend. It is true that testimony was offered that the compensation of Abernethy and McHenry was reasonable, *116 but we learned of no instance where the bonuses reached the sums paid in this case, and we note with interest that the manager hired by Abernethy in his new dealership since leaving petitioner, was limited to a bonus of $20,000 regardless of how high the profits might go. In the instant case we have the managerial duties divided between two officers and regard must be had to the total compensation paid for such services. After carefully weighing the many factors bearing on the question, we have decided that $50,000 would be reasonable compensation for the services of Abernethy and McHenry for 1946, or $25,000 for each officer, and that to the extent the deduction exceeded that figure, it was properly disallowed by respondent. As to the year 1945, we think the total of $29,055.34 paid by petitioner to Abernethy and McHenry was reasonable and that respondent was in error in disallowing any part of that amount. Decision will be entered under Rule 50.